STATE OF NORTH CAROLINA v. SETH ANTHONY LUPEK

No. COA11-63

(Filed 2 August 2011)

**Search and Seizure—search of home—general inquiry—no reasonable expectation of privacy—plain view doctrine applicable—motion to suppress properly denied**

The trial court did not err in a manufacturing marijuana and maintaining a dwelling place for the purpose of storing or selling controlled substances case by denying defendant's motion to suppress evidence obtained as a result of a search at his home. The trial court's unchallenged findings established that the officer had a right to be on defendant's porch because he was conducting a general inquiry in a place where defendant had no reasonable expectation of privacy and defendant's argument that the plain view doctrine did not apply was overruled.

Appeal by defendant from judgment entered 2 September 2010 by Judge Carl R. Fox in Chatham County Superior Court. Heard in the Court of Appeals 25 May 2011.

*Attorney General Roy Cooper, by Associate Attorney General Gayle L. Kemp, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Kristen L. Todd, for defendant-appellant.*

GEER, Judge.

Defendant Seth Anthony Lupek appeals from his convictions of manufacturing marijuana and maintaining a dwelling place for the purpose of storing or selling controlled substances. Defendant contends that the trial court erred in denying his motion to suppress evidence obtained as a result of a search at his home.

The investigating officer in this case was standing on defendant's front porch when he saw, through the open front door, a bong used for smoking marijuana. Defendant primarily argues that his motion to suppress should have been allowed because the officer did not have the right to be on the front porch. However, the trial court's findings, unchallenged on appeal, establish that the officer had a right to be on the porch because he was conducting a general inquiry in a place where defendant had no reasonable expectation of privacy. We also

STATE v. LUPEK

[214 N.C. App. 146 (2011)]

find unpersuasive defendant's remaining arguments regarding application of the plain view doctrine to the officer's observation of the bong and, therefore, hold that the trial court did not err in denying defendant's motion to suppress.

## Facts

On 19 January 2010, defendant was indicted for manufacturing marijuana, maintaining a dwelling place for the purpose of storing or selling controlled substances, felony possession of marijuana, and misdemeanor possession of drug paraphernalia. On 10 May 2010, defendant filed a motion to suppress items seized during a 24 September 2009 search of his home. The motion alleged in part that the evidence should be suppressed because the officer who discovered it had no legal right to enter defendant's residence where the evidence was discovered, and the evidence was not in the officer's plain view from a place where he had a right to be.

Following an evidentiary hearing, the trial court entered an order denying defendant's motion on 19 November 2010. In its order, the trial court made the following findings of fact. At approximately 5:00 p.m. on 24 September 2009, Deputy Paul Carroll of the Chatham County Sheriff's Department responded to a report of a dog's having been shot at White's Mobile Home Park. On his way to defendant's residence in the mobile home park, Deputy Carroll was stopped by defendant. Defendant told Deputy Carroll that his dog had just been shot by a neighbor, and he was going to pick up the dog from Animal Control. Defendant then left the mobile home park.

Deputy Carroll continued to defendant's residence and pulled into the driveway. Almost immediately, a woman exited the front door of the residence. She was very nervous, her hands were shaking, and she smelled strongly of burnt marijuana. Based on his training and experience, Deputy Carroll believed that the smell was consistent with someone having just smoked marijuana. The woman told Deputy Carroll that her name was Elizabeth Sweatt and that she did not live at the residence, but was staying there temporarily.

Deputy Carroll had received information that dogs had gotten loose and become aggressive with a neighbor who had then shot one of the dogs. Ms. Sweatt took Deputy Carroll to the rear of the trailer and showed him a hole in the side of defendant's home where the dogs had escaped.

Deputy Carroll completed his investigation concerning the dog shooting, but he noticed that Ms. Sweatt, who still smelled like burnt

marijuana, appeared to be extremely nervous. Deputy Carroll asked her why she was so nervous. At this point, his reason for remaining in the yard was Ms. Sweatt's nervous appearance and the smell of burnt marijuana. Ms. Sweatt told Deputy Carroll she had a nervous condition for which she took Xanax. Believing that Ms. Sweatt was nervous as a result of his presence and her use of marijuana, rather than a " 'nervous condition,' " Deputy Carroll asked Ms. Sweatt to produce a prescription for the Xanax. Ms. Sweatt informed him that her pills were not there, but were inside her car that her husband was driving at the time.

Deputy Carroll then asked Ms. Sweatt for identification. When conducting an investigation, Deputy Carroll always attempts to obtain identification from any witnesses. Ms. Sweatt did not verbally respond to his request, but she instead turned and went back around to the front door and opened the door. Deputy Carroll followed closely behind her, attempting to maintain visual contact and ensure she would not obtain a weapon from inside the home that could be used against him. He was approximately two steps or a foot to a foot and a half behind her when she opened the door.

Because Ms. Sweatt was short, Deputy Carroll could see over her head into the residence. Without entering the home, he saw directly across from the door an 18-inch glass bong used for smoking marijuana. He also smelled the odor of fresh marijuana and saw the back of a man's head in a recliner.

Ms. Sweatt attempted to shut the door, but Deputy Carroll still entered the residence. Deputy Carroll advised both Ms. Sweatt and the man, subsequently identified as Barry Beaver, to stay where they were and show him their hands. Deputy Carroll asked if they had any weapons and patted them down. He also searched the immediate area for any weapons that might be within their reach. Deputy Carroll then obtained identification from both Ms. Sweatt and Mr. Beaver. At this point, the odor of fresh marijuana was even stronger. Without venturing further into the residence, Deputy Carroll saw a salad bowl with fresh marijuana.

Ms. Sweatt denied knowledge of any marijuana in the residence and consented to a search of her bedroom at the rear of the trailer. The odor of fresh marijuana was very strong in that part of the trailer. Next to Ms. Sweatt's room was a closed door that Deputy Carroll opened to make sure no one else was in the trailer. Inside that room he found a "marijuana-growing operation" with marijuana plants.

After discovering the marijuana-growing operation, Deputy Carroll handcuffed Ms. Sweatt and placed her in his patrol car. Since Mr. Beaver was disabled and unable to walk, Deputy Carroll carried him outside in his wheelchair. Deputy Carroll then secured the residence and did not seize any items before contacting the Drug Unit and requesting that it respond and obtain a search warrant. Staff Sergeant Brandon Jones subsequently applied for a search warrant for defendant's residence. Later, defendant returned to the residence and was arrested.

Based on its findings of fact, the trial court concluded that Deputy Carroll was justified in being outside the front door of the trailer at the time he saw the bong and smelled fresh marijuana. The court determined that he had the legitimate and lawful purpose of investigating possible criminal activity after smelling marijuana on Ms. Sweatt's person and noticing that she was very nervous for no apparent reason. The court also concluded that Deputy Carroll had the right to ask for Ms. Sweatt's identification and to approach the door to inquire whether she was willing to answer questions. Furthermore, after seeing the marijuana in the salad bowl, Deputy Carroll had authority to enter the premises to effectuate an arrest, conduct a protective sweep of the area, and secure the residence to prevent the destruction of evidence.

On 2 September 2010, defendant pled guilty to manufacturing marijuana and maintaining a dwelling place for storage of controlled substances. Defendant reserved his right to appeal the denial of his motion to suppress. The trial court sentenced defendant to a mitigated-range term of three to four months imprisonment but suspended the sentence and ordered defendant to be placed on 24 months of supervised probation. Defendant timely appealed to this Court.

## Discussion

The sole issue on appeal is whether the trial court erred in denying defendant's motion to suppress. "The scope of review of the denial of a motion to suppress is 'strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law.' " *State v. Bone*, 354 N.C. 1, 7, 550 S.E.2d 482, 486 (2001) (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)), *cert. denied*, 535 U.S. 940, 152 L. Ed. 2d 231, 122 S. Ct. 1323 (2002).

Findings of fact not challenged on appeal—such as those in this case—are binding on this Court. *State v. Brown*, 199 N.C. App. 253, 256, 681 S.E.2d 460, 463 (2009). The trial court's conclusions of law, however, "must be legally correct, reflecting a correct application of applicable legal principles to the facts found." *State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997).

Defendant argues that Deputy Carroll's observation of the bong inside the home constituted an unconstitutional search, and, therefore, the bong and all subsequently discovered evidence should have been suppressed. The State contends that the "plain view" doctrine applied to the bong. In order for the plain view doctrine to apply, (1) the officer must have been in a place where he had a right to be when the evidence was discovered; (2) the evidence must have been discovered inadvertently; and (3) it must have been immediately apparent to the police that the items observed were evidence of a crime or contraband. *State v. Graves*, 135 N.C. App. 216, 219, 519 S.E.2d 770, 772 (1999). The burden is on the State to establish all three prongs of the plain view doctrine. *Id.*

Defendant challenges the trial court's conclusion regarding the first prong: Deputy Carroll's right to be on the porch when he saw the bong and smelled the fresh marijuana. Defendant contends that the porch is part of the curtilage of his residence, that Deputy Carroll did not have the necessary probable cause to enter the curtilage, and that Deputy Carroll thus did not have a right to be just outside the front door of the trailer at the time he saw the bong and smelled the marijuana.

"The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." *United States v. Dunn*, 480 U.S. 294, 300, 94 L. Ed. 2d 326, 334, 107 S. Ct. 1134, 1139 (1987). "[T]he curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180, 80 L. Ed. 2d 214, 225, 104 S. Ct. 1735, 1742 (1984) (internal citation and quotation marks omitted). "In North Carolina, 'curtilage of the home will ordinarily be construed to include at least the yard around the dwelling house as well as the area occupied by barns, cribs, and other outbuildings.' " *State v. Rhodes*, 151 N.C. App. 208, 214, 565 S.E.2d 266, 270, (quoting *State v. Frizzelle*, 243 N.C. 49, 51, 89 S.E.2d 725, 726 (1955)), *disc. review denied*, 356 N.C. 173, 569 S.E.2d 273 (2002).

Because an individual ordinarily possesses the highest expectation of privacy within the curtilage of his home, that area typically is "afforded the most stringent Fourth Amendment protection." *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 49 L. Ed. 2d 1116, 1130, 96 S. Ct. 3074, 3084 (1976). Thus, as with the home, probable cause is the appropriate standard for searches of the curtilage. *Oliver*, 466 U.S. at 178, 80 L. Ed. 2d at 224, 104 S. Ct. at 1741.

In North Carolina, however, no search of the curtilage occurs when an officer is in a place where the public is allowed to be, such as at the front door of a house. It is well established that "[e]ntrance [by law enforcement officers] onto private property for the purpose of a general inquiry or interview is proper." *State v. Prevette*, 43 N.C. App. 450, 455, 259 S.E.2d 595, 599-600 (1979), *appeal dismissed and disc. review denied*, 299 N.C. 124, 261 S.E.2d 925-26, *cert. denied*, 447 U.S. 906, 64 L. Ed. 2d 855, 100 S. Ct. 2988 (1980). Officers "are entitled to go to a door to inquire about a matter; they are not trespassers under these circumstances." *Id.*, 259 S.E.2d at 600. *See also State v. Stover*, 200 N.C. App. 506, 512, 685 S.E.2d 127, 132 (2009) (officers were properly at defendant's house to conduct " 'knock and talk' " after having received information from confidential informant that she had bought marijuana at house).

In *Prevette*, the Court upheld the denial of the defendants' motion to suppress marijuana that officers saw through defendants' screen door. The trial court found that the police had received an anonymous tip that a house near a dairy farm was full of marijuana, but that this tip was insufficient to obtain a search warrant. 43 N.C. App. at 452, 259 S.E.2d at 598. The officers decided to conduct a general inquiry and investigation of the area by determining whether the houses in that area were occupied and interviewing any occupants. *Id.* As the officers walked up to a house, one of the defendants ran from the back door and attempted to hide in a cornfield. *Id.* at 453, 259 S.E.2d at 598. He was apprehended and questioned by the officers at the front of the house. *Id.* The trial court found that the officers, while standing in the light of the front porch, could see through the screen door and observed marijuana on the floor and smelled marijuana inside. *Id.*

This Court held that "[i]t was not erroneous for the judge to conclude that the officers, standing on the porch of defendants' house, were lawfully at the scene." *Id.* at 455, 259 S.E.2d at 600. The trial court's findings properly supported its conclusion "that the officers,

while standing on the porch, 'viewed in plain view and smelled on the inside of the house what appeared to them to be marijuana.' " *Id.*

Defendant contends that *Prevette* is distinguishable from this case because the *Prevette* officers' inquiry was initiated as a result of an anonymous tip regarding the presence of drugs in the area. The anonymous tip was, however, simply the trigger for the officers going to the location to investigate—it was relevant only because it explained why an investigation was needed. Here, like the officers in *Prevette*, Deputy Carroll was not just randomly knocking on doors. Rather, Deputy Carroll was responding to a call regarding a dog shooting, defendant confirmed that his dog was shot by a neighbor, and Deputy Carroll went to defendant's residence to investigate that potential crime.

There is no meaningful distinction between this case and *Prevette*. In both cases, the officers were conducting a general investigation and inquiry regarding a call reporting a potential crime. Defendant argues that because the dog was shot in the yard, Deputy Carroll had no right to be on the front porch even if he did have a right to be in the yard. The trial court, however, found that at the time Deputy Carroll was on the front porch, he was attempting to obtain identification from a witness in his investigation of the dog shooting, and he was making an additional inquiry arising out of his observation of Ms. Sweatt's nervousness and the smell of burnt marijuana surrounding her. Because Deputy Carroll was still conducting an investigation and inquiry when he reached the front door, we hold that *Prevette* controls this appeal.

Defendant's additional claim that Deputy Carroll needed probable cause to follow Ms. Sweatt to the front door is inconsistent with *Prevette. See also Harbin v. City of Alexandria*, 712 F. Supp. 67, 72 (E.D. Va. 1989) (holding front porch is knowingly exposed to public; therefore, it is not subject of Fourth Amendment protection), *aff'd per curiam*, 908 F.2d 967 (4th Cir. 1990); *State v. Detlefson*, 335 So.2d 371, 372 (Fla. App. 1976) ("It cannot be said the defendant had a reasonable expectation of privacy in the front porch of his home where, presumably, delivery men and others were free to observe the plants thereon.").

Defendant repeatedly insists that Ms. Sweatt tried to shut the door on Deputy Carroll, indicating that "she did not want him coming up to the front door or accessing the interior of the trailer." The trial court, however, found that Ms. Sweatt tried to shut the door only

after Deputy Carroll was on the porch and had already seen the bong. That finding is binding on appeal.

Defendant points to *State v. Wooding*, 117 N.C. App. 109, 449 S.E.2d 760 (1994), as supporting his contention that Deputy Carroll's peering through the front door without a warrant violated his constitutional rights. In *Wooding*, however, the police officer was able to see into the hallway of the apartment only after walking onto a back porch, leaning over a couch, and looking through a three to four-inch opening in drawn curtains covering the window. *Id.* at 112-13, 449 S.E.2d at 761-62. Here, instead of going to a back porch and peeking in a closed window curtain, Deputy Carroll merely followed Ms. Sweatt to the front door because she appeared to be retrieving her identification in response to his request, and he only saw the bong inside because she opened the door.

We, therefore, conclude that the trial court's finding that Deputy Carroll was justified in being on the doorstep was not legally incorrect, as this front porch was a place where he had the right to be. Accordingly, the trial court did not err in applying the plain view doctrine. *See Kentucky v. King*, ___ U.S. ___, ___, 179 L. Ed. 2d 865, 876-77, 131 S. Ct. 1849, 1858 (2011) (explaining that so long as law enforcement officer lawfully arrives at spot from which observation is made, "it does not matter that the officer who makes the observation may have gone to the spot from which the evidence was seen with the hope of being able to view and seize the evidence").

Defendant further contends that even if Deputy Carroll was lawfully on the porch, the plain view doctrine should not apply because Deputy Carroll was only able to see inside the trailer because Ms. Sweatt opened the door "pursuant to his demand to see her identification." Defendant argues that had Deputy Carroll not, under color of his authority as a Deputy Sheriff, "ordered Ms. Sweat [sic] to produce identification," she never would have opened the front door of the house, and Deputy Carroll never would have been able to see the bong.

In support of his position, defendant cites four federal cases that are neither analogous nor persuasive. *See United States v. Conner*, 127 F.3d 663, 665 (8th Cir. 1997) (police knocked on motel room door three separate times and identified themselves each time; one officer shouted, " 'Open up' " in voice loud enough to be heard by motel resident two rooms away; officers were loud enough to awaken another guest and cause her to step out of her room under mistaken belief that police were knocking at her door); *United States v. Jerez*, 108

F.3d 684, 691-92 (7th Cir. 1997) (during night, officers took turns knocking on motel room door for three minutes, identified themselves as police, and commanded, " 'Open the door' "; officer knocked on room's only window for one-and-a-half to two minutes, loud enough that it could be heard from interior hallway on other side of room; officer shone his flashlight through small opening in window's drapes, illuminating defendant as he lay in bed); *United States v. Tovar-Rico*, 61 F.3d 1529, 1535 (11th Cir. 1995) (at least five officers knocked loudly at door, announced their identity as police officers through closed door, and requested permission to enter); *United States v. Winsor*, 846 F.2d 1569, 1571 (9th Cir. 1988) (two police officers and an FBI agent, with their guns drawn, knocked on door and announced, " 'Police. Open the door.' ").

In each of these cases, the police expressly demanded that the door be opened and used their identification as police officers to convince the defendants that they had no other choice. Here, by contrast, the court found that Deputy Carroll merely "asked" for Ms. Sweatt's identification. Deputy Carroll was within his right to do so. *See State v. Isenhour*, 194 N.C. App. 539, 542, 670 S.E.2d 264, 267 (2008) (noting even when police officers have no reason to suspect that person is engaged in criminal behavior, they may pose questions and ask for identification provided they do not induce cooperation by coercive means). *See also State v. Mayfield*, 10 Kan. App. 2d 175, 179, 694 P.2d 915, 918 (1985) (holding police officers, whom court concluded were authorized to request defendant's identification, were justified in following him into apartment without his invitation when he went to get it; thus, being in place where they had right to be, they were allowed, under plain view exception, to seize obvious contraband discovered through inadvertence). Moreover, Deputy Carroll asked for identification only once before Ms. Sweatt turned around and walked toward the front door. Deputy Carroll never verbally commanded that she go inside or "open the door." We, therefore, overrule defendant's argument that the plain view doctrine does not apply in this case.

Defendant makes no claim that even if the observation of the bong and the smelling of the marijuana was constitutional, the conduct following that discovery still violated his Fourth Amendment rights. Accordingly, the trial court did not err in denying defendant's motion to suppress.

Affirmed.

Judges BRYANT and BEASLEY concur.