NO. COA14-50

 NORTH CAROLINA COURT OF APPEALS

 Filed: 6 January 2015

STATE OF NORTH CAROLINA

 v. Wake County
 Nos. 10 CRS 225; 5855-56

JASON KEITH WILLIFORD

 Appeal by defendant from judgments entered 7 June 2012 by

Judge Paul G. Gessner in Wake County Superior Court. Heard in

the Court of Appeals 13 August 2014.

 Attorney General Roy Cooper, by Assistant Attorney General
 Anne M. Middleton, for the State.

 Law Offices of John R. Mills NPC, by John R. Mills, for
 defendant-appellant.

 CALABRIA, Judge.

 Jason Keith Williford (“defendant”) appeals from judgments

entered upon jury verdicts finding him guilty of first degree

murder, first degree rape, and misdemeanor breaking and

entering. We find no error.

 I. Background

 Late in the evening on 5 March 2010, defendant broke into

the home of John Geil (“Geil”) in Raleigh, North Carolina. On
 -2-
that date, Kathy Taft (“Taft”) and her sister, Dina Holton

(“Holton”), were staying in Geil’s home while Taft recovered

from a recent surgery. Geil was out of town, and so the two

women were in his home alone.

 Defendant entered Taft’s bedroom and struck her in the head

with a blunt object multiple times. He then removed her

clothing and raped her before exiting the home. Holton heard

noises in the house during the night, but did not discover what

had happened to Taft until the next morning.

 In the morning on 6 March 2010, Holton went to the bedroom

where she had last seen Taft, and she discovered Taft completely

nude and bleeding from the head. Holton called 911, and

emergency medical services transported Taft to the hospital. At

the hospital, a nurse noticed signs of trauma around Taft’s

vagina and blood on her anus. As a result, hospital personnel

collected a rape kit in order to obtain DNA samples. Taft

underwent emergency neurosurgery, but ultimately died from her

head wounds on 9 March 2010.

 The DNA samples from the rape kit were tested and

determined to contain male DNA. As a result, law enforcement

officers from the Raleigh Police Department (“RPD”) canvassed

the area around Geil’s home and attempted to obtain DNA samples
 -3-
from male residents. When RPD Detective Zeke Morris (“Det.

Morris”) reached the home of defendant, who lived nearby,

defendant did not invite Det. Morris inside, as all of his

neighbors had done, but only spoke briefly with him. Det.

Morris returned later to seek a sample of defendant’s DNA, and

defendant refused to provide the sample.

 After defendant’s refusal, members of the RPD Fugitive Unit

began conducting surveillance on him in an attempt to obtain his

DNA. On 15 April 2010, RPD Officer Gary L. Davis (“Officer

Davis”) parked his unmarked vehicle in a parking lot directly

adjacent to defendant’s multi-unit apartment building while

defendant was shopping at a nearby grocery store. When

defendant returned, Officer Davis observed defendant smoking a

cigarette as he exited his vehicle. Defendant then finished the

cigarette and dropped the butt onto the ground in the parking

lot. Shortly thereafter, RPD Officer Paul Dorsey (“Officer

Dorsey”) entered the parking lot. Officer Dorsey approached

defendant and spoke to him in order to distract him while

Officer Davis retrieved the cigarette butt. After securing the

butt, the officers left the apartment building.

 Subsequent DNA testing revealed that defendant’s DNA was a

match for the DNA collected from the rape kit and from the crime
 -4-
scene. Consequently, defendant was arrested and indicted for

first degree murder, first degree rape and first degree

burglary. On 16 December 2010, the State notified defendant

that it intended to rely upon evidence of aggravating

circumstances and seek a sentence of death for the charge of

first degree murder.

 On 26 August 2011, defendant filed a motion to suppress the

DNA evidence which was collected from the cigarette butt

recovered from the parking lot. In his motion, defendant

contended that the cigarette butt was discarded in an area which

constituted the curtilage of his apartment and that defendant

never surrendered his privacy interest in the cigarette butt.

Defendant argued that under these circumstances, Officer Davis’s

retrieval and subsequent analysis of the cigarette butt without

a warrant violated his constitutional rights.

 Defendant’s motion was heard on 20 February 2012. On 9

March 2012, the trial court entered an order denying the motion

to suppress. The court concluded that the parking lot where

Officer Davis recovered the cigarette butt was outside the

curtilage of defendant’s apartment and that defendant had

voluntarily discarded it.
 -5-
 Defendant was tried by a jury beginning 16 May 2012 in Wake

County Superior Court. On 1 June 2012, the jury returned

verdicts finding defendant guilty of first degree murder, first

degree rape, and the lesser-included offense of misdemeanor

breaking and entering. On 7 June 2012, the jury recommended

that defendant be sentenced to life imprisonment without the

possibility of parole. Based upon this recommendation, the

trial court sentenced defendant to life without parole for the

first degree murder charge. Defendant also received a

consecutive sentence of a minimum of 276 months to a maximum of

341 months for the first degree rape charge and a concurrent

sentence of 45 days for the misdemeanor breaking and entering

charge. Defendant appeals.

 II. Motion to Suppress

 Defendant argues that the trial court erred by denying his

motion to suppress the DNA evidence obtained from the discarded

cigarette butt. Specifically, defendant contends: (1) that the

cigarette butt was discarded in the curtilage of his dwelling;

(2) that he never abandoned his possessory interest in the

cigarette butt; and (3) that the DNA on the cigarette butt was

improperly tested without a warrant. We disagree.
 -6-
 Our review of a trial court’s denial of a motion to

suppress is “strictly limited to determining whether the trial

judge’s underlying findings of fact are supported by competent

evidence, in which event they are conclusively binding on

appeal, and whether those factual findings in turn support the

judge’s ultimate conclusions of law.” State v. Cooke, 306 N.C.

132, 134, 291 S.E.2d 618, 619 (1982). Since defendant does not

challenge any of the trial court’s findings, “our review is

limited to the question of whether the trial court’s findings of

fact, which are presumed to be supported by competent evidence,

support its conclusions of law and judgment.” State v. Downing,

169 N.C. App. 790, 794, 613 S.E.2d 35, 38 (2005).

 A. Curtilage

 Defendant first argues that Officer Davis’s seizure of the

cigarette butt violated his constitutional rights because it

occurred within the curtilage of his apartment. “Both the

United States and North Carolina Constitutions protect against

unreasonable searches and seizures.” State v. Otto, 366 N.C.

134, 136, 726 S.E.2d 824, 827 (2012) (citing U.S. Const. amend.

IV; N.C. Const. art. I, § 20). “Because an individual

ordinarily possesses the highest expectation of privacy within

the curtilage of his home, that area typically is ‘afforded the
 -7-
most stringent Fourth Amendment protection.’” State v. Lupek,

214 N.C. App. 146, 151, 712 S.E.2d 915, 919 (2011) (quoting

United States v. Martinez-Fuerte, 428 U.S. 543, 561, 49 L. Ed.

2d 1116, 1130, 96 S. Ct. 3074, 3084 (1976)).

 “The United States Supreme Court has . . . defined the

curtilage of a private house as ‘a place where the occupants

have a reasonable and legitimate expectation of privacy that

society is prepared to accept.’” State v. Washington, 134 N.C.

App. 479, 483, 518 S.E.2d 14, 16 (1999) (quoting Dow Chemical

Co. v. United States, 476 U.S. 227, 235, 90 L. Ed. 2d 226, 235,

106 S. Ct. 1819, 1825 (1986)). The United States Supreme Court

has further established that the “curtilage question should be

resolved with particular reference to four factors: the

proximity of the area claimed to be curtilage to the home,

whether the area is included within an enclosure surrounding the

home, the nature of the uses to which the area is put, and the

steps taken by the resident to protect the area from observation

by people passing by.” United States v. Dunn, 480 U.S. 294, 301,

94 L. Ed. 2d 326, 334-35, 107 S. Ct. 1134, 1139 (1987).

 Although this Court has previously utilized the Dunn

factors to determine whether certain areas are located within a

property’s curtilage, see, e.g., State v. Washington, 86 N.C.
 -8-
App. 235, 240-42, 357 S.E.2d 419, 423-24 (1987), we have never

done so in the specific context of multi-unit dwellings. A

federal appeals court which considered this issue in that

context noted that “[i]n a modern urban multi-family apartment

house, the area within the ‘curtilage’ is necessarily much more

limited than in the case of a rural dwelling subject to one

owner’s control.” United States v. Cruz Pagan, 537 F.2d 554,

558 (1st Cir. 1976). This is because “none of the occupants can

have a reasonable expectation of privacy in areas that are also

used by other occupants.” State v. Johnson, 793 A.2d 619, 629

(N.J. 2002) (internal quotation and citation omitted).

 Thus, in United States v. Stanley, the United States Court

of Appeals for the Fourth Circuit held that “the common area

parking lot on which [the defendant]’s automobile was parked was

not within the curtilage of his mobile home.” 597 F.2d 866, 870

(4th Cir. 1979). In reaching this conclusion, the Stanley Court

relied upon the following factors: (1) that “[t]he parking lot

was used by three other tenants of the mobile home park;” (2)

that the parking lot “contained parking spaces for six or seven

cars. No particular space was assigned to any tenant;” and (3)

that “[a]lthough on the day of the search the Cadillac was

parked in a space close to [the defendant]’s home, that space
 -9-
was not annexed to his home or within the general enclosure

surrounding his home.” Id. Other courts have also reached the

same conclusion based upon similar facts. See, e.g., Cruz

Pagan, 537 F.2d at 558 (“In sum, we hold that the agents’ entry

into the underground parking garage of El Girasol Condominium

did not violate the fourth amendment. . . .”); United States v.

Soliz, 129 F.3d 499, 503 (9th Cir. 1997) (Common parking area in

an apartment complex which “was a shared area used by the

residents and guests for the mundane, open and notorious

activity of parking” was not curtilage.), overruled on other

grounds by United States v. Johnson, 256 F.3d 895, 913 n.4 (9th

Cir. 2001) (en banc); Commonwealth v. McCarthy, 705 N.E.2d 1110,

1114 (Mass. 1999) (“Because the defendant had no reasonable

expectation of privacy in the visitor’s parking space, the space

was not within the curtilage of the defendant’s apartment.”);

and State v. Coburne, 518 P.2d 747, 757 (Wash. Ct. App. 1973)

(“The vehicle was parked in an alley parking lot available to

all users of the apartments. The area where the car was parked

is not a ‘curtilage’ protected by the Fourth Amendment.”). But

see Joyner v. State, 303 So.2d 60, 64 (Fla. Dist. Ct. App. 1974)

(holding that “parking areas usually and customarily used in

common by occupants of apartment houses, condominiums and other
 -10-
such complexes with other occupants thereof constitute a part of

the curtilage of a specifically described apartment or

condominium or other living unit thereof”).

 In the instant case, the trial court’s unchallenged

findings indicate that the shared parking lot where defendant

discarded the cigarette butt was located directly in front of

defendant’s four-unit apartment building, that the lot was

uncovered, that it included five to seven parking spaces used by

the four units, and that the spaces were not assigned to

particular units. The court further found that the area between

the road and the parking lot was heavily wooded, but that there

was no gate restricting access to the lot and there were no

signs which suggested either that access to the parking lot was

restricted or that the lot was private. Applying the Dunn

factors to these findings, we conclude that the parking lot was

not located in the curtilage of defendant’s building. While the

parking lot was in close proximity to the building, it was not

enclosed, was used for parking by both the buildings’ residents

and the general public, and was only protected in a limited way.

Consequently, the parking lot was not a location where defendant

possessed “a reasonable and legitimate expectation of privacy

that society is prepared to accept.” Washington, 134 N.C. App.
 -11-
at 483, 518 S.E.2d at 16 (internal quotation and citation

omitted). Thus, defendant’s constitutional rights were not

violated when Officer Davis seized the discarded cigarette butt

from the parking lot without a warrant. This argument is

overruled.

 B. Possessory Interest

 Defendant next contends that even if the parking lot was

not considered curtilage, he still maintained a possessory

interest in the cigarette butt since he did not put it in a

trash can or otherwise convey it to a third party. However, it

is well established that “[w]here the presence of the police is

lawful and the discard occurs in a public place where the

defendant cannot reasonably have any continued expectancy of

privacy in the discarded property, the property will be deemed

abandoned for purposes of search and seizure.” State v.

Cromartie, 55 N.C. App. 221, 224, 284 S.E.2d 728, 730 (1981)

(internal quotations, citation, and brackets omitted).

Moreover, “[w]hen one abandons property, ‘[t]here can be nothing

unlawful in the Government’s appropriation of such abandoned

property.’” Id. at 225, 284 S.E.2d at 730. (quoting Abel v.

United States, 362 U.S. 217, 241, 4 L. Ed. 2d 668, 687, 80 S.

Ct. 683, 698 (1960)). In the instant case, we have already
 -12-
determined that defendant had no reasonable expectation of

privacy in the parking lot, and thus, by dropping the cigarette

butt in the lot, he is deemed to have abandoned any interest in

it. This argument is overruled.

 C. DNA Testing

 Finally, defendant argues that even if law enforcement

lawfully obtained the cigarette butt, they still were required

to obtain a warrant before testing the butt for his DNA because

defendant had a legitimate expectation of privacy in his DNA.

Defendant cites Maryland v. King, ___ U.S. ___, 186 L. Ed. 2d

1, 133 S. Ct. 1958 (2013) in support of his argument. In King,

the United States Supreme Court considered whether the

warrantless, compulsory collection and analysis of a DNA sample

from individuals who had been arrested for felony offenses

violated the Fourth Amendment. Id. at ___, 186 L. Ed. 2d at 17,

133 S. Ct. at 1966. The Court held that this warrantless search

was reasonable because of the state’s significant interest in

accurately identifying the arrestee. Id. at ___, 186 L. Ed. 2d

at 32, 133 S. Ct. at 1980.

 King is inapplicable to the instant case. In King, the

defendant’s DNA sample had been directly obtained by law

enforcement in a compulsory seizure that was indisputably a
 -13-
Fourth Amendment search. The King Court only decided whether

that search was reasonable. In contrast, in this case,

defendant had abandoned his interest in the cigarette butt,

without any compulsion from law enforcement, and thus, we must

first determine whether the extraction of defendant’s DNA from

the abandoned butt constituted a search at all. This Court has

specifically held that “[t]he protection of the Fourth Amendment

against unreasonable searches and seizures does not extend to

abandoned property.” State v. Eaton, 210 N.C. App. 142, 148,

707 S.E.2d 642, 647 (2011). While we have not yet applied this

general principle to the retrieval of DNA from abandoned

property, courts in other jurisdictions have relied upon it to

conclude that the extraction of DNA from an abandoned item does

not implicate the Fourth Amendment. See, e.g., People v.

Gallego, 117 Cal. Rptr. 3d 907, 913 (Cal. Ct. App. 2010) (“By

voluntarily discarding his cigarette butt on the public

sidewalk, defendant actively demonstrated an intent to abandon

the item and, necessarily, any of his DNA that may have been

contained thereon. ... On these facts, we conclude that a

reasonable expectation of privacy did not arise in the DNA test

of the cigarette butt, and consequently neither did a search for

Fourth Amendment purposes.”); Raynor v. State, 99 A.3d 753, 767
 -14-
(Md. 2014) (“[W]e hold that DNA testing of . . . genetic

material, not obtained by means of a physical intrusion into the

person’s body, is no more a search for purposes of the Fourth

Amendment, than is the testing of fingerprints, or the

observation of any other identifying feature revealed to the

public—visage, apparent age, body type, skin color.”); and State

v. Athan, 158 P.3d 27, 37 (Wash. 2007) (en banc) (“There is no

subjective expectation of privacy in discarded genetic material

just as there is no subjective expectation of privacy in

fingerprints or footprints left in a public place. ... The

analysis of DNA obtained without forcible compulsion and

analyzed by the government for comparison to evidence found at a

crime scene is not a search under the Fourth Amendment.”). We

find these cases persuasive, and thus, we hold that once

defendant voluntarily abandoned the cigarette butt in a public

place, he could no longer assert any constitutional privacy

interest in it. Accordingly, the extraction of his DNA from the

butt did not constitute a search for purposes of the Fourth

Amendment. This argument is overruled.

 III. Judgment

 Defendant argues that his judgment includes a clerical

error, in that the trial court failed to check the “Class A
 -15-
Felony” box in the portion of the judgment that explains why

defendant was sentenced to life imprisonment without parole.

However, the judgment indicates that defendant was sentenced for

a Class A felony in two other locations. Thus, we find it

unnecessary to remand this case for the judgment to indicate,

for a third time, that defendant was sentenced to life

imprisonment based upon a conviction for a Class A felony.

 IV. Conclusion

 Pursuant to the factors in Dunn, the shared parking lot

located in front of defendant’s four-unit apartment building was

not part of the curtilage of defendant’s apartment. Since

defendant did not have a reasonable expectation of privacy in

the parking lot, he abandoned his cigarette butt by discarding

it there. After defendant voluntarily abandoned the cigarette

butt, its subsequent collection and analysis by law enforcement

did not implicate defendant’s constitutional rights. Defendant

received a fair trial, free from error.

 No error.

 Judges ELMORE and STEPHENS concur.